Chester L. EDGERTON

v.

STATE OF NORTH CAROLINA.

Civ. No. 1369.

United States District Court
E. D. North Carolina,
Raleigh Division.
May 26, 1964.

BUTLER, Chief Judge.

This is an application for a writ of habeas corpus on behalf of Chester Louis Edgerton, a state prisoner, now confined under a sentence of life imprisonment imposed by the Superior Court of Vance County, North Carolina, upon the petitioner's plea of guilty of the offense of first-degree burglary.

The petitioner alleges that he was arrested on November 19, 1957, on a warrant charging two capital offenses: burglary in the first degree, and rape; that he remained in jail without knowledge of the charges against him and without legal advice or assistance until January 13, 1958; that on January 13 the grand jury indicted him for these two offenses; that on that date counsel were appointed by the court; that immediately his court-appointed counsel approached him with a previously prepared plea of guilty to the burglary charge and urged him to sign it in order to save his life; that he refused to sign that day, but that the attorneys continued to urge him to plead guilty because they had obtained an agreement from the Solicitor to accept such plea resulting in a life sentence; that on January 14, 1958,[1] "relying wholly on the integrity and loyalty" of his counsel and in fear of his life and not because he was guilty, he pleaded guilty to the burglary charge and the charge of rape was dismissed.

On July 7, 1962, upon consideration of the State court records, this court entered an order denying relief without a hearing. The Fourth Circuit Court of Appeals, 315 F.2d 676, reversed and remanded for a hearing. Accordingly, a plenary hearing was held to resolve the factual issues raised by the application.

Upon consideration of the State court records and the evidence offered at the hearing, the court finds the following facts:

1. Petitioner was arrested on November 19, 1957, on a warrant charging breaking and entering and attempted

Thomas F. Ellis, Raleigh, N. C., for petitioner.

T. Wade Bruton, Atty. Gen., State of North Carolina, Raleigh, N. C., by Theodore C. Brown, Jr., Staff Atty., Raleigh, N. C., for respondent.

1. The record in the State court indicates that the plea was entered on January 15, 1958. The evidence at the hearing substantiates this.

rape, and confined in the Vance County Jail. A hearing was set for November 22, 1957, in the Recorder's court at Henderson, N. C.

2. On November 21, 1957, T. P. Gholson, an attorney of Henderson, N. C., conferred with petitioner at the jail at the request of petitioner's aunt. Mr. Gholson agreed to appear for him at the preliminary hearing, which was continued until December 6, 1957.

3. Prior to the preliminary hearing Mr. Gholson conferred with the Sheriff and the other investigating officers about the charges against petitioner. Mr. Gholson then appeared for the petitioner at the hearing and entered a plea of not guilty in his behalf. The prosecuting witnesses, Luvinia Jordan and Rosa Mae Crute, her seven-year old daughter, testified in substance that Edgerton forced his way into Luvinia Jordan's house during the night of November 18, 1957, and raped Rosa Mae Crute. Probable cause was found and petitioner was bound over to the superior court. After the hearing Mr. Gholson's motion to withdraw as counsel was allowed.

4. On January 13, 1958, the petitioner was indicted by the grand jury for first-degree burglary and rape. On that same date, which was the opening day of the January Term of the Superior Court of Vance County, the superior court Judge assigned Charles W. Williamson, a member of the local bar, to represent the petitioner. Mr. Williamson questioned the investigating officers and conferred with the petitioner, who was very uncooperative. Mr. Williamson had also been present in the Recorder's court on December 6 and had heard the testimony of the prosecuting witnesses at the preliminary hearing. Mr. Williamson then requested the Judge to allow him to withdraw from the case because of the petitioner's uncooperative attitude. The request was denied, but the following morning, January 14, Charles F. Blackburn and Robert S. Hight, two members of the local bar, were assigned to aid in the defense. A continuance was granted until the March, 1958 Term.

5. The attorneys discussed the case among themselves, talked to the officers involved, questioned Dr. Robert G. Currin, the physician who had examined the little girl, and conferred with the petitioner. Edgerton denied being present at the scene of the alleged offenses, but could not furnish the names of any witnesses in his behalf.

That afternoon the State Solicitor questioned Luvinia Jordan, Rosa Mae Crute, and Dr. Currin, in the presence of counsel. After hearing the testimony of these three witnesses counsel became convinced there was sufficient evidence to support a verdict of guilty of both charges.[2]

6. Counsel again discussed the matter with the petitioner, who then admitted being present on the night in question but continued to be evasive. He still could not offer a reasonable defense or furnish witnesses in his behalf. Counsel then concluded that the best strategy would be to urge the Solicitor to accept a plea and thus be assured of saving the petitioner's life.

The attorneys suggested to Edgerton that he tender a plea and explained that, if it were accepted, the sentence would be life imprisonment.[3] Edgerton was reluctant to agree to enter such a plea and

2. Luvinia Jordan stated that Edgerton had forced his way into the house by kicking the latch off the door. Rosa Mae Crute said that he put his privates into her privates. Dr. Currin stated that there had been some penetration, although it appeared that the rape had not been consummated. North Carolina has consistently held that there is sexual intercourse in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. See State v. Jones, 249 N.C. 134, 105 S.E.2d 513 (1958) and the authorities cited therein.

3. The North Carolina statute provides that a person charged with a capital offense may tender in writing a plea of guilty signed by such person and his counsel which, if accepted by the State with the approval of the court, shall result in a

counsel did not try to compel him to do so. At that time the Solicitor had not agreed to accept a plea and had informed counsel that he planned to prosecute Edgerton for his life.

7. That night attorneys Blackburn and Hight visited the Solicitor at his hotel and negotiated an agreement whereby the State would take a nolle prosequi on the rape charge upon Edgerton's plea of guilty to first-degree burglary.[4]

8. The following morning, January 15, counsel conferred with the petitioner and explained the agreement that had been reached with the Solicitor. Petitioner then agreed to enter the guilty plea. Later that morning the plea was typed by the court reporter and signed in the presence of the Clerk of Court.

The foregoing account of the circumstances surrounding the case make it clear that many of petitioner's allegations are false. The petitioner did not remain in jail for sixty days without legal advice or knowledge of the charges against him as alleged. On the contrary, he received a preliminary hearing at which he was represented by counsel and informed of the charges.

When petitioner's case came on for trial in January 1958, three experienced attorneys were assigned to represent him. They did not confront him with a previously prepared plea of guilty on the day of their assignment. In fact, when Edgerton eventually did sign the guilty plea, counsel had already obtained a continuance. Therefore, there was no exigency in which counsel lacked an opportunity to prepare a defense, and it does not follow that Edgerton signed the plea solely because of fear that no preparations had been made for his defense.

Counsel made diligent inquiry into the circumstances, questioned all known witnesses, and talked at length with Edgerton. At no time did Edgerton give counsel the names of any witnesses or give them any indication of a plausible defense. He was evasive and uncooperative. Faced with the choice of going to trial for two capital felonies without a reasonable defense, or entering a plea of guilty to the burglary charge and thus being assured of avoiding the death penalty, counsel advised the latter, whereby the petitioner would receive a life sentence and become eligible for parole after ten years,

■■ The evidence presented by the State subsequent to the entry of the plea established a prima facie case of first-degree burglary and rape.[5] Thus it cannot be said in light of all the circumstances known to counsel that the recommendation to plead guilty to the burglary charge arose from lack of preparation or otherwise indicated ineffective assistance of counsel. Only in extreme circumstances in which the representation has been so inadequate as to make a farce of the trial can it be said that a defendant was deprived of his constitutional rights. Snead v. Smyth, 273 F.2d 838 (4th Cir. 1959).

■■ Although it appears that the petitioner was hesitant to change his plea to guilty, nevertheless his choice was understandingly and voluntarily made and was not the result of psychological coercion. It is not improper for counsel to explain to a client that he faces a possible death sentence if he elects to go to trial upon a plea of not guilty to a capital offense. Brown v. Smyth, 271 F.2d 227 (4th Cir. 1959). Indeed it is a

sentence of life imprisonment. N.C.Gen. Stat. § 15-162.1.

4. Counsel testified at the hearing that a controlling factor in the Solicitor's agreement to accept the plea was the congested state of the docket at the January Term. They were of the opinion that such an agreement could not have been reached at a later term.

5. The testimony of Luvinia Jordan, Rosa Mae Crute, and Dr. Currin paralleled the statements they had given petitioner's counsel. See note 2, supra. In addition, one of the investigating officers testified that the door to the house had been forced open.

lawyer's duty to advise his client of the risks involved.

The court concludes from the totality of the circumstances that the petitioner was not denied his constitutional rights and his application for a writ of habeas corpus is hereby denied.