IN THE SUPREME COURT OF NORTH CAROLINA

No. 88A20

Filed 11 December 2020

IN THE MATTER OF: T.N.C., D.M.C.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 24 October 2019 by Judge David V. Byrd in District Court, Wilkes County. This matter was calendared in the Supreme Court on 23 November 2020, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Erika Leigh Hamby for petitioner-appellee Wilkes County Department of Social Services.*
>
> *Matthew P. McGuire for appellee Guardian ad Litem.*
>
> *Mary McCullers Reece for respondent-appellant mother.*

MORGAN, Justice.

Respondent-mother appeared and was represented by counsel at a termination of parental rights hearing held 5 June 2019. Respondent-mother contends that her counsel's brief cross-examination of a witness for the Wilkes County Department of Social Services (DSS) during the termination hearing and her counsel's acquiescent closing arguments constituted ineffective assistance of counsel. Because respondent-mother has not shown how she was prejudiced by the allegedly ineffective assistance

of her counsel, we affirm the trial court's orders terminating respondent-mother's parental rights to the two juveniles who are the subject of this appeal.

## *Factual and Procedural Background*

Respondent-mother is the mother of four children. Two of respondent-mother's children are the juveniles involved in this termination of parental rights matter: T.N.C. (Tammy) and D.M.C. (Dan)[1]. DSS became involved with Tammy and Dan in May 2016, after receiving reports of improper supervision of the children by the parents, substance abuse by the parents, incidents of domestic violence between the parents, and a lack of food within the family home. The children were placed initially with a safety resource on 2 July 2016 and DSS began to offer case management services to the family on 13 September 2016. At this point, however, respondent-mother became incarcerated on methamphetamine-related charges. On 29 December 2016, DSS filed a petition alleging that Tammy, Dan, and their two stepsiblings were neglected juveniles based on respondent-mother's incarceration, and the failure of the father of Tammy and Dan to make timely progress on his case plan. The trial court adjudicated the children to be neglected juveniles and placed them in the custody of DSS by court order entered on 20 April 2017.

---

[1] Pseudonyms are substituted for the juveniles' real names to protect their identities and for ease of reading.

Upon her release from incarceration, respondent-mother entered into her own case plan on 11 April 2017 which required respondent-mother to attend parenting classes, obtain substance abuse and mental health assessments and follow any recommended treatments, obtain and maintain appropriate housing, establish and maintain employment, and submit to drug screens when requested by DSS. However, following respondent-mother's absconsion from probation and subsequent conviction for additional drug charges on 31 October 2018, DSS filed petitions to terminate respondent-mother's parental rights to Tammy and Dan on the ground of neglect and the ground of willfully leaving the children in a placement outside the home for more than twelve months without making reasonable progress toward correcting the conditions that led to their removal from the home pursuant to N.C.G.S. § 7B-1111(a)(1)–(2). The trial court held a hearing on the termination petitions on 5 June 2019. Although respondent-mother was still in custody, she was present for the proceedings and was represented by counsel.

During the termination of parental rights hearing, the active participation of respondent-mother's counsel consisted of a short cross-examination of one of DSS's witnesses in the course of the adjudication stage, along with the presentation of a conciliatory closing argument after both the adjudication and disposition stages. For the hearing's adjudication phase, DSS presented the testimony of its social worker who was assigned to the underlying neglect case. The social worker was the agency's sole adjudication witness. The cross-examination of the social worker by respondent-

mother's counsel during adjudication focused upon the "significant amount of time that [respondent-mother has] been incarcerated" and its prevention of respondent-mother's ability from attending approximately 60% of her allotted visitations with Tammy and Dan. The total exchange between respondent-mother's counsel and DSS's social worker during cross-examination of the witness consisted of the following:

> Q: And unfortunately the real[i]ty was if I'm doing my math right, [respondent-mother] has been incarcerated for approximately 60 percent of this case. Does that sound about any [sic] accurate number?
>
> A: I haven't done the math, but she's been in and out. We had a stretch kind of from January until she, you know, absconded, that we had a potential period to get some things done but we were not able to maintain the housing or employment; things of that type.
>
> Q: Well, I'm just doing percentages based on the number of visits you said she couldn't have because she was incarcerated. So it's been a significant amount of time that she's been incarcerated?
>
> A: Uh hum. She's been in jail or incarcerated quite a lot.
>
> Q: And obviously it's true that the mother hasn't been out since last September?
>
> A: That's correct.
>
> Q: I will state the obvious, she's not done anything on her plan that she could do during that nine months?
>
> A: I don't know what's offered at that facility. I've not had any contact with her since July 3rd, of 2018.

> [Respondent-Mother's Counsel]: No further questions, Your Honor.

As for his closing argument on adjudication, respondent-mother's counsel offered this presentation:

> Well, Your Honor, unfortunately I cannot disagree with most of the facts that [DSS's counsel] has outlayed regarding [respondent-mother's] incarceration. I mean it's accurate. She was incarcerated when this started. She's incarcerated now. She's going to be incarcerated for the next three months. Obviously when she was out she did make some progress. Parenting classes, never failed drug tests, and I understand she had some -- but obviously, you know, as I kind of discussed this with her with this stage of the proceeding and her current situation, the court will apply the law and obviously I would ask you not to find the grounds but again I think you are someone as aware of the laws in regards to this situation.

Seizing upon the conciliatory tone of this closing argument, the guardian ad litem's counsel subsequently argued that, "by [respondent-mother's] own admission they [DSS representatives] have proven the grounds that DSS has alleged." At the conclusion of the adjudication stage of the proceedings, the trial court announced its determination of the existence of both grounds for termination of respondent-mother's parental rights which were alleged in DSS's petitions. The hearing then moved to the disposition phase, in which DSS presented two witnesses in an effort to substantiate the agency's position that it was in the best interests of the juveniles Tammy and Dan to terminate respondent-mother's parental rights.

Following DSS's presentation of its case during the disposition stage, respondent-mother's counsel ended the closing argument on behalf of respondent-mother with these observations:

> As [the father's counsel] said, these are always difficult cases for a lot of reasons. One, and similarly as [DSS's counsel] outlined, obviously I represent [respondent-mother] who is sitting here behind me and [respondent-mother] one thing, I would actually echo this. [Respondent-mother has] always been easy to deal with. [Respondent-mother has] always been pretty good about what she wants to do and so [respondent-mother is] not making any excuses for where she's at. It was her own actions that got her there and as you heard, time has gone by and the kids have been in custody for a while. The silver lining there which I like to tell parents is and as we go through this, as we're trying to go through this, you always want your kids to land somewhere good, land somewhere decent, where they're going to be happy, where they're going to be taken care of. Because no matter what [respondent-mother's] situation is or anybody's situation is at the end of the day that's fine -- it's about the kids being happy and taken care of. So [respondent-mother] is certainly very appreciative that they've landed in the spot that they are. She has told the words she actually said to me -- I'm not putting this in her mouth. This is her exact words to me. That she has a lot of respect for what they do and what they've done for her and her children. It's -- it's something she very much appreciates and she likes hearing her children are happy and they're taken [sic] of, they're protected, and they are -- I guess as much as I'm sure it hurts, they're where they want to be at this point in time. I find it encouraging that they still ask about her. I agree with [DSS's counsel] to some extent. I think some of the questions are of concern. I think that would be natural. But I also think some of it is that there is a bond there and there is an affection with the parents and I agree with [the father's counsel], I can't remember the last time I heard the question asked are either of these kids in therapy and the answer was no. So there is some positives. Obviously the court has to make --

has to make the decision what is in the best interest of the children. I can't stand here and change the facts. I can't change the facts that [respondent-mother] is in custody and won't be out for three months. And in all candor I think in being honest with herself and I [sic] least I would probably tell her, I think it could take [respondent-mother] a little while to get back on her feet and get herself set up and try to basically take care of herself after the pain of that but that's going to take some time. Obviously she wants her children. Obviously she never wanted her rights terminated. But again, I'm not making any excuses for her current situation. Because it's -- even though it hurts on this side, again, the kids are in a good situation. That's all anybody wants for their kids. Obviously, I'm ethically bound -- I'm duty bound to ask you not to terminate her rights. But obviously I understand the court is well versed along those lines.

On 24 October 2019, the trial court entered orders in which it found the existence of both alleged grounds for termination of the parental rights of respondent-mother by clear, cogent, and convincing evidence and concluded that termination of respondent-mother's parental rights was in the best interests of both juveniles. The trial court then terminated the parental rights of respondent-mother to the children Tammy and Dan through entry of the termination orders.

Respondent-mother appeals to this Court from the trial court's orders. Before us, respondent-mother does not challenge the substance of the trial court's termination of parental rights orders. Instead, she contends that her trial counsel provided ineffective assistance, thus rendering the termination proceedings fundamentally unfair.

*Analysis*

North Carolina General Statutes Section 7B-1101.1(a) provides that a parent in a termination of parental rights proceeding "has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right." N.C.G.S. § 7B-1101.1(a) (2019). Counsel necessarily must provide effective assistance, as the alternative would render any statutory right to counsel potentially meaningless. *See State v. Sneed*, 284 N.C. 606, 612, 201 S.E.2d 867, 871 (1974) (stating that the right to counsel "is not intended to be an empty formality but is intended to guarantee effective assistance of counsel."); *see also In re Bishop*, 92 N.C. App. 662, 664, 375 S.E.2d 676, 678 (1989) ("By providing a statutory right to counsel in termination proceedings, our legislature has recognized that this interest must be safeguarded by adequate legal representation."). "To prevail on a claim of ineffective assistance of counsel, respondent must show that counsel's performance was deficient and the deficiency was so serious as to deprive her of a fair hearing." *In re Bishop*, 92 N.C. App. at 665, 375 S.E.2d at 679 (citing *State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985)). To make the latter showing, the respondent must prove that "there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings." *Braswell*, 312 N.C. at 563, 324 S.E.2d at 248.

Respondent-mother contends in the instant case that the totality of counsel's actions during the termination of parental rights hearing "highlighted [respondent-mother]'s weaknesses and extolled the reasonableness of an order terminating her

parental rights. [Respondent-mother] would have been better served by silence." She claims that her counsel violated his duty of zealous advocacy and implies that his tempered representation of respondent-mother's interests was "so deficient as to amount in every respect to no representation at all," quoting *State v. Davidson*, 77 N.C. App. 540, 546, 335 S.E.2d 518, 522 (1985), *disc. review denied*, 315 N.C. 393, 338 S.E.2d 882 (1986).

While a substantial amount of the tone of the advocacy of respondent-mother's counsel could reasonably be described as acquiescent in nature, nonetheless it is implausible to categorize counsel's statements here with the characterizations of the accused by his defense counsel in *Davidson*, who made the following comments about the defendant to the trial court during the sentencing phase of the case:

> Your Honor, every now and then you get appointed in a case where you have very little to say and this is one of them. I have talked to [the defendant] in the jail on three or four occasions. I talked to him, as you know, in the lock up before the trial began. The information that he has furnished me is not consistent with other information available to the State and information furnished me by [the prosecuting attorney] with regard to the man's criminal record. He has just completed doing a ten year sentence, he tells me, for armed robbery and he did not make me aware of that until after [the prosecuting attorney] had furnished me certain materials that he had available to him.
>
> As you very well know, I begged and pleaded with him to take a negotiated plea. He was not willing to do that. I informed this Court before the trial began and the record reflects that I did not think that he had any available, reasonable defense under the law of this state; consequently, I had very little to say.

> And, unless he would care to make a statement, I've
> said all I care to.

*Id*. at 545, 335 S.E.2d at 521 (alterations in original). The Court of Appeals explained

that in its opinion in *Davidson* that defense counsel's argument "consisted almost

exclusively of commentary entirely negative to defendant," and the lower appellate

court expressed dismay that counsel "disparage[ed the defendant] before the court."

*Id*. at 545, 335 S.E.2d at 521–22. The counsel's advocacy at issue in *Davidson*, which

presented his client "in an entirely negative light," created "a considerable

probability" that the statement "had an adverse impact" on the defendant's treatment

by the tribunal. *Id*. at 546–47, 335 S.E.2d at 522. The defendant in *Davidson*,

therefore, was entitled to a new sentencing hearing accompanied by representation

that would not "undermine . . . confidence in the outcome." *Id*. at 547, 335 S.E.2d at

522.

By contrast, counsel's actions and arguments in the case at bar were not

"altogether lacking in positive advocacy." *Id*. at 545, 335 S.E.2d at 521. Respondent-

mother's counsel mentioned multiple facts in her favor during closing arguments,

specifically noting that respondent-mother "did make some progress" on her case

plan, that she still had a bond with her children, and that she did not want her rights

to be terminated. Respondent-mother's counsel spoke favorably of his client,

emphasizing her positive traits that she has "always been easy to deal with" and

"always been pretty good about what she wants to do and so [she]'s not making any

excuses for where she's at." Moreover, respondent-mother's counsel unequivocally

asked the trial court to rule in his client's favor during his closing arguments at the close of both the adjudication and disposition phases of the hearing. Although respondent-mother challenges the moderate tone of her counsel's presentation on her behalf, it strains credibility to characterize her counsel's representation of her interests as the equivalent of "no representation at all." *Id.* at 546, 335 S.E.2d at 522 (citation omitted); *see also In re C.D.H.*, 265 N.C. App. 609, 613, 829 S.E.2d 690, 693 (2019) (explaining that a lack of positive advocacy does not necessarily equate to ineffective assistance because "it is possible that 'resourceful preparation reveal[ed] nothing positive to be said for' Mother" (alteration in original) (citation omitted)).

Furthermore, unlike defense counsel's negative representations of defendant during the sentencing phase of *Davidson* after the accused's determination of guilt, the observations by respondent-mother's counsel of respondent-mother in the course of both the adjudication and disposition phases in the case sub judice were positive depictions of her. Any candor, acceptance, or recognition regarding respondent-mother's circumstances in her situation as a parent which her counsel strategically elected to intersperse among his overt statements to trumpet and preserve respondent-mother's parental rights cannot be deemed by this Court to rise to the level of ineffective assistance of counsel as demonstrated in *Davidson*.

As we earlier recognized in the recitation of the guidelines addressed in our decision in *Braswell* which was applied by the Court of Appeals in its *Bishop* opinion, in order to prevail on a claim of ineffective assistance of counsel, a party in the

position of respondent-mother here must show both that counsel's performance was deficient and that this deficiency was so serious as to deprive the party of a fair hearing. We further instructed in *Braswell* that the gauge for the deprivation of a fair hearing in this regard is the existence of a reasonable probability that, but for the errors of the party's counsel, there would have been a different result in the proceedings. In the case before us, respondent-mother has failed to show deficient performance by her counsel in the representation of her interests in either the tone or content of the closing arguments, or in the brevity of the cross-examination by respondent-mother's counsel of the testifying witness for DSS during the adjudication phase of the hearing. In light of the insufficient establishment of a deficient performance by her counsel to amount to ineffective assistance of counsel, consequently respondent-mother cannot show any prejudice suffered by her as to the result in the proceedings.

The undisputed evidence presented at the termination of parental rights hearing supports the trial court's conclusions that at least one ground existed to terminate the parental rights of respondent-mother and that termination was in Tammy and Dan's best interests. In the face of the strength of this evidence, respondent-mother has not shown a reasonable probability that the outcome of the termination hearing would have been different if her counsel's representation of her interests had been different.

This Court has addressed and resolved the only issue which respondent-mother has brought before us in this appeal, which is whether she received ineffective assistance from her counsel during the adjudication and disposition phases of the hearing which led to the termination of respondent-mother's parental rights to the juveniles Tammy and Dan. We have determined that respondent-mother's counsel did not render ineffective assistance and consequently there was no prejudice to her in the proceedings of the hearing. Respondent-mother has not challenged the trial court's findings of fact or conclusions of law in her pursuit of this appeal. As a result, having found that respondent-mother did not receive ineffective assistance of counsel, and having recognized that the trial court's findings of fact and conclusions of law remain intact and binding by virtue of their unchallenged nature, we affirm the trial court's decision to terminate the parental rights of respondent-mother.

*Conclusion*

Based upon the foregoing facts, circumstances, and analysis, we affirm the orders of the trial court which terminate the parental rights of respondent-mother.

AFFIRMED.